25CA0412 Marriage of Kline 03-05-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA0412
Weld County District Court No. 22DR30214
Honorable Kimberly B. Schutt, Judge

In re the Marriage of

Rachel D. Kline,

Appellant,

and

Christopher W. Kline,

Appellee.

ORDER AFFIRMED

Division VI
Opinion by JUDGE GROVE
Yun and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 5, 2026

Hampton & Pigott LLP, David J. Pigott, Natalie T. Chase, Broomfield, Colorado,
for Appellant

Paige Mackey Murry LLC, Paige Mackey Murray, Boulder, Colorado, for
Appellee

¶ 1    Rachel D. Kline (mother) appeals the district court's order allocating parental time and decision-making responsibilities. We affirm.

I.    Background

¶ 2    Mother and Christopher W. Kline (father) married in 2005 after father's first tour of duty in Iraq. Father completed three tours of duty in Iraq and ceased serving in the Marine Corps in 2006. As a result of his military experience, father struggles with anxiety and post-traumatic stress disorder (PTSD).[1]

¶ 3    The marriage produced three children, all of whom now attend secondary and primary school.

¶ 4    Mother testified and the district court found that there were several instances of domestic abuse and coercive control during the marriage. For example, mother testified that father lost his temper, threw and destroyed their property, restricted mother to certain spaces through intimidation, abandoned her in a foreign country, sexually assaulted her, tracked her movements, and engaged in

---

[1] Mother was also diagnosed with post-traumatic stress disorder in 2024.

other acts of harassment and intimidation.  No police were involved in any of the reported incidents.

¶ 5     After father had an extramarital affair, he and mother began verbally fighting, sometimes in front of the children.  They began living separately in 2021, and mother filed for divorce in 2022. Mother and father spent a year attempting to reconcile and temporarily split child custody during this time.  The court entered a decree of dissolution of marriage in July 2023.

¶ 6     In November 2023, the court granted mother a temporary protection order against father after he entered her home uninvited. The couple then agreed to a temporary 5-2-2-5 custody arrangement and agreed to the appointment of Dr. Jane Derk as the expert for the parental responsibility evaluation (PRE) to recommend a permanent parental responsibility arrangement.

¶ 7     Meanwhile, the Colorado General Assembly passed House Bill 24-1350 (H.B. 24-1350), a law that focuses on child safety in court proceedings affecting the child's care and custody when there are instances of intimate partner violence.  H.B. 24-1350, 75th Gen. Assemb., 1st Reg. Sess. (Colo. 2024); Ch. 344, sec. 1(1)(a), 2024 Colo. Sess. Laws 2332.  The law took effect on August 7, 2024, and,

2

as relevant here, it added "coercive control" as a type of intimate partner violence and instructed the court to consider evidence, certain factors, and make certain statements when determining parental responsibilities in cases involving allegations or findings related to intimate partner violence.  H.B. 24-1350; Ch. 344, secs. 3, 5-6, §§ 14-10-124(1.3)(a), (4)(e), (9), -127(11)(a), -127.5(2)(a.3), (3.5), 2024 Colo. Sess. Laws 2336-38, 2341-44.

¶ 8    The PRE was filed in July 2024, before H.B. 24-1350 went into effect.  After the PRE was filed, the district court held several hearings to address remaining issues, including parenting time, decision-making, and child support and whether to issue a permanent restraining order against father.  The court made oral rulings on these issues in October 2024, followed by a subsequent written order incorporating those rulings in January 2025.  In its order, the district court

- vacated the temporary protection order and, instead, limited contact between mother and father and set restrictions on necessary communications;

- continued and made permanent the 5-2-2-5 child custody arrangement except for holidays, which followed a separate schedule; and

- directed mother and father to "attempt to make all the major decisions for the children jointly" but gave mother tiebreaking authority in the event of an impasse, among other caveats.

¶ 9    Mother appeals these orders, contending that the district court erred when it "ordered a 5-2-2-5 schedule and joint decision making" despite having found husband had engaged in "domestic abuse" and "coercive control." Relatedly, she argues that the court "misapplied the law in adopting the recommendations of the PRE because the PRE failed to conform to statute." We address each contention below.

## II.    Sufficiency of the PRE

¶ 10    For the first time on appeal, mother contends that the district court should not have relied on the PRE because it did not meet the minimum requirements set forth in section 14-10-127, C.R.S. 2025. We do not reach the merits of this argument, however, because it is unpreserved.

4

¶ 11    When a party in a civil case fails to present an argument to the trial court, the argument is deemed waived; thus, we will not consider it for the first time on appeal. *O'Connell v. Biomet, Inc.*, 250 P.3d 1278, 1283 (Colo. App. 2010). A party need not use any "talismanic language" to preserve an argument for appeal. *In re Estate of Owens*, 2017 COA 53, ¶ 21. But the party's argument must be specific enough to alert the district court to the issue and to provide the court an adequate opportunity to rule on it. *Id.* A general argument does not necessarily preserve all related subsidiary arguments. *In re Estate of Ramstetter*, 2016 COA 81, ¶ 67. Moreover, a party's mere opposition to its adversary's request does not preserve all potential avenues of relief on appeal; instead, only the specific arguments a party pursued before the district court are reviewed. *Valentine v. Mountain States Mut. Cas. Co.*, 252 P.3d 1182, 1188 (Colo. App. 2011).

¶ 12    Regarding preservation, mother — without citing to the record — asserts that she "raised the issue of [father's] domestic violence, [and] its impact on the family throughout the dissolution proceedings," noting that "[t]he trial court ruled on the question of domestic violence." But mother did not contend in the district court

5

that the PRE did not satisfy the requirements of section 14-10-127 when it was completed, nor did she argue that the PRE should be revised to conform to the 2024 amendments. Because mother did not raise this issue in the district court, it is not preserved and we do not consider it further.

### III.    Parenting Schedule and Decision-Making

¶ 13    Mother contends that the district court's findings do not support its adopted 5-2-2-5 parenting time schedule or its assignment of parental decision-making responsibilities.[2] We are not persuaded.

### A.    Standard of Review

¶ 14    We uphold the district court's factual findings unless they are clearly erroneous. C.R.C.P. 52. We review its ruling on parenting time for an abuse of discretion. *In re Marriage of Collins*, 2023 COA

---

[2] Once again, mother's preservation citations only state that she generally objected to issues related to domestic violence throughout the proceedings. However, specific objections to a court's orders are generally not required to preserve arguments for appeal. *See In re Marriage of Crouch*, 2021 COA 3, ¶ 17 ("[A] party is not required to object to the trial court's findings in the trial court to preserve a challenge to those findings." (citation omitted)); C.R.C.P. 52 ("Neither requests for findings nor objections to findings rendered are necessary for purposes of review.").

116M, ¶ 8.  We also review for an abuse of discretion the district court's allocation of decision-making responsibility.  *In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15.

¶ 15    A district court abuses its discretion when it acts in a manifestly arbitrary, unfair, or unreasonable manner.  *In re Marriage of Page*, 70 P.3d 579, 581 (Colo. App. 2003).  It also abuses its discretion when it misapplies the law.  *In re Marriage of Smith*, 2024 COA 95, ¶¶ 64-65.

¶ 16    We disregard any error or defect in the proceeding that does not affect the substantial rights of the parties.  C.R.C.P. 61; *see* C.A.R. 35(c).

## B.    Parenting Time Schedule

¶ 17    Mother asserts that the district court abused its discretion when it incorporated "the legal standard by which it denied [mother's] request for permanent protection order" into its allocation of parenting time.  She also argues that the court failed to make sufficient findings to demonstrate that its allocation of parenting time prioritized the children's safety, especially given its parallel finding that father committed domestic violence.

## 1.    Additional Facts

¶ 18    After holding a two-part evidentiary hearing, the district court issued an oral ruling on whether to make the temporary protection order against father permanent, as well as rulings on the allocation of parenting time, child support, and decision-making responsibilities.

¶ 19    The court first addressed the protection order. It recited the legal standard for entering a permanent order and then found by a preponderance of the evidence that father had committed acts "that would rise to the level of being domestic abuse — and certainly coercive control" as defined in the recently enacted H.B. 24-1350. The court observed that father had engaged in verbal abuse and "threats that would . . . [make mother] feel like she was in some sort of physical danger." It then reiterated that it found credible evidence of "domestic abuse." *See* § 13-14-101(2), C.R.S. 2025 (defining domestic abuse as a "threatened act of violence, stalking, harassment, or coercion that is committed by a person" against another living in the same domicile).

¶ 20    Nevertheless, the court concluded that the abuse by father did not "rise to the level of needing — a permanent protection order."

*See* § 13-14-106(1)(a), C.R.S. 2025.  However, relying on its authority under section 14-10-124, C.R.S. 2025, the court did decide to limit contact between the parties in order to ensure that their communications were safe and would have a minimal impact on the children.

¶ 21     Turning to the allocation of parenting time under section 14-10-124, the court noted the PRE's conclusions that "the children have a good relationship with each of their parents," that the children were "bonded with both of the parents" and "want to spend time with both of their parents," and that they "struggle when they're away from either parent for any great length of time."  The court also acknowledged that the children had been struggling with the divorce, as demonstrated by poor school performance, bedwetting, and other behavioral issues.

¶ 22     According to the PRE, the eldest child requested that the 5-2-2-5 parenting schedule stay in place, and Dr. Derk also recommended the schedule remain unchanged.  The court agreed. It concluded that it could not find any

> compelling reason to ignore the
> recommendations of [the parental
> responsibilities evaluator] or the[] other factors

> to order that [father's] parenting time be reduced. Notwithstanding the fact that there has been a finding of domestic violence, there's not evidence that there's been any sort of abuse involving the children. — The evidence is that he is a good parent.

¶ 23 The court added that the children "have been safe in [father's] care" and expressed concern that further change would add to the children's current struggles.

¶ 24 The court incorporated its oral findings and rulings into a written order, issued a few months later.

## 2. Applicable Law

¶ 25 A district court must allocate parenting time based on the best interests of the child, applying the factors in section 14-10-124(1.5)(a) and giving paramount consideration to the physical, mental, and emotional conditions and needs of the child. *In re Marriage of Morgan*, 2018 COA 116M, ¶ 17. However, if domestic violence is an issue in the case, the court must also consider the factors in section 14-10-124(4). § 14-10-124(1.5)(a); *Morgan*, ¶ 18.

¶ 26 Applicable here, when the court finds that one party, by a preponderance of the evidence, has committed an act of domestic violence, it shall consider "conditions on parenting time that ensure

10

the safety of the child and abused party, giving paramount consideration to the safety and the physical, mental, and emotional conditions and needs of the child and abused party." § 14-10-124(4)(e). This includes limiting contact between the parties. § 14-10-124(4)(e)(I).

¶ 27    If there "is any information" that a parent has committed domestic violence or coercive control, the court shall also "make a statement in writing or orally on the proceeding record regarding why unsupervised parenting time" for said parent was "determined to be in the best interests of the child with paramount consideration given to the child's safety and the physical, mental, and emotional conditions and needs of the child." § 14-10-124(9).

¶ 28    In addition, if allegations of domestic violence are made, the district court "shall give strong consideration to a child's stated preference" if the stated preference is consistent with the "paramount consideration given to the child's safety and the physical, mental, and emotional conditions and needs of the child." § 14-10-127.5(3.5), C.R.S. 2025. And when allocating parental responsibilities, the court shall, among other factors, "[c]onsider

evidence related to the use of coercive control by a party." § 14-10-127.5(3)(a)(III).

### 3.    Analysis

¶ 29    As we understand it, mother contends that the court's findings that father engaged in domestic violence and coercive control were inconsistent with its decision to allocate equal parenting time. Noting that the court was free to deviate from the PRE's recommendation, she argues that the court "erroneously incorporated the legal standard by which it denied [mother's] request for [a] permanent protection order and failed completely to apply the standards of [section] 14-10-127.5" because it did not make "specific findings of fact[] as to the children's safety while in the care of an abusive intimate partner."

¶ 30    We discern no legal error. Nothing in the court's order suggests that it did not give "paramount consideration" to the children's safety, as well as their "physical, mental, and emotional conditions." § 14-10-127.5(3.5). To the contrary, the court noted that it was taking into account the new legislative requirements, and, based on the evidence from the permanent orders hearing, the recommendations in the PRE, and the eldest child's stated wishes,

12

it determined that an equal parenting time schedule remained appropriate. While the court found that father had engaged in domestic violence and coercive control, it went on to state "why unsupervised parenting time" with father remained in the children's best interests. *See* §§ 14-10-124(9), -127.5(3.5).

¶ 31    The court first addressed the children's "physical, mental, and emotional conditions and needs." § 14-10-127.5(3.5). It found that maintaining the 5-2-2-5 schedule was justified for "all of the reasons" it had previously mentioned and that it had no "compelling reason" to depart from the recommendations of the parental responsibilities evaluator and no "other factors to order" that father's parenting time be reduced. The court emphasized that the children's emotional needs included their parental bonds, acknowledged their desire "to spend time with both of their parents," and found that a "further change" in the allocation of parental time would be "a greater source of struggle for them." It accepted the PRE's finding that the children had difficulties when they were away "from either parent for any great length of time" and found that the children's physical, mental, and emotional struggles — such as wetting the bed, struggling in school, and

13

behavioral issues — were due to "severe family adjustment due to the divorce" rather than other circumstances. In the same vein, the court recognized that, by "put[ting] the children in the middle of [the divorce]," the parties were causing the children physical, mental, and emotional harm. The court therefore ordered mother and father to take a co-parenting class for high-conflict divorces to help them recognize their own "control[] issues."

¶ 32 The court also addressed the children's safety. Again, it observed that — aside from findings of domestic violence and coercive control — nothing in the record warranted a reduction in father's parenting time. The court found that there was "no evidence that there's been any sort of abuse involving the children" and that "[the children] have been safe in [father's] care." The court also acknowledged statements in the PRE indicating that father sought treatment for his PTSD after the marriage fell apart and that, according to the PRE, father had "good behavior management skills" and "expressed a lot of love" for his children, who were "very comfortable with him." It also noted there had been no further evidence of domestic violence since the temporary protection order was put in place. Nonetheless, as discussed above, the court still

ordered that the parties have limited contact to ensure the children's safety.

¶ 33     These findings were sufficient to support a conclusion that the court gave "paramount consideration" to the children's "safety and the[ir] physical, mental, and emotional conditions and needs." §§ 14-10-124(9), -127.5(3.5).  The court, with record support, found that an equal parenting time schedule would not endanger the children and that reducing father's parenting time would likely cause immediate physical, emotional, and mental harm.  It also took measures to reduce the likelihood that the children would be unsafe in his custody.  As a result, we discern no error in the court's permanent adoption of the existing 5-2-2-5 schedule.

### C.     Parental Decision-Making

¶ 34     Mother next contends that the district court abused its discretion by awarding joint decision-making and appointing a parenting coordinator and decision-maker (PCDM).  We conclude that these arguments are waived.

### 1.     Applicable Law

¶ 35     Section 14-10-124(4)(a)(II) provides, in pertinent part:

If the court finds by a preponderance of the evidence that one of the parties has committed domestic violence:

(A) It shall not be in the best interests of the child to allocate mutual decision-making responsibility over the objection of the other party . . . unless the court finds that there is credible evidence of the ability of the parties to make decisions cooperatively in the best interest of the child in a manner that is safe for the abused party and the child; and

(B) The court shall not appoint a parenting coordinator solely to ensure that mutual decision-making can be accomplished.

§ 14-10-124(4)(a)(II)(A)-(B).

## 2. Additional Facts

¶ 36    In her written closing argument, mother requested joint decision-making with tiebreaking authority:

The PRE recommended a hybrid form of joint decision making, whereby the parties try to make major decisions jointly, and exchange discussions at least twice, but in the end if the parties cannot make the decision jointly, [m]other would have the final say. Mother believes that this form of decision making would serve the children's best interest while encouraging the parties to engage in coparenting.

¶ 37    The district court adopted this recommendation, ordering that the parties must have "two notifications and a minimum of two

exchanges of information and investigation of the options," but if they reached an impasse, "[m]other would have the final say or be the tie breaker and be able to make the decision." And the court gave mother even more authority than she requested, ruling that she would have the final say in "major issues such as therapy, medical decisions, [and] educational decisions that need[ed] to be made right away." In addition, the court also found that for all non-major, non-pressing issues, the parties had "agreed to engage [with] a [PCDM] . . . if they've reached an impasse."

### 3. Analysis

¶ 38 Father argues that mother waived her challenge to the court's allocation of decision-making (or invited any error) because she proposed the joint decision-making allocation that the court granted and also agreed to the PCDM. Mother did not address the preservation of this issue in her opening brief. In her reply brief, however, she generally asserts that "[t]he parties litigated domestic abuse throughout the case" and that the district court's "factual findings of domestic violence preserve the court's erroneous order for a PCDM under [section] 14-10-127.5." In the alternative, she asserts that "[t]he request for a PCDM in the record is a result of

17

attorney incompetence, and therefore preserved and reviewable on appeal."

¶ 39     Our review of the record confirms that mother, through counsel, affirmatively requested joint allocation of decision-making, with her acting as a tiebreaker. And the court determined — based on a representation by mother's counsel that she "believe[d] there was a stipulation" regarding father's request for a PCDM[3] — that the parties had "agreed to engage a [PCDM] . . . if they've reached an impasse."

¶ 40     A party may waive an issue by intentionally relinquishing a known right. *Bernache v. Brown*, 2020 COA 106, ¶ 10. "Waiver may be express, as when a party states its intent to abandon an existing right, or implied, as when a party engages in conduct which manifests an intent to relinquish the right or acts inconsistently with its assertion." *In re Marriage of Hill*, 166 P.3d 269, 273 (Colo. App. 2007).

---

[3] Regarding father's request for a PCDM, mother's counsel made the following representation: "I believe there's a stipulation to appointing a PCDM. We just haven't gotten to the identity of one but that was talked about. So I wanted to make a record."

18

¶ 41    We conclude that mother waived any challenge to the court's allocation of decision-making responsibility by requesting the relief that the district court granted. We likewise conclude that counsel's representation to the court that there had been "a stipulation" to the PCDM also amounted to a waiver. Accordingly, because mother's arguments are not properly before us, we decline to address them further.

## IV.    Attorney Fees

¶ 42    Father requests an award of attorney fees and costs pursuant to section 13-17-102(4), C.R.S. 2025, and C.A.R. 38(b) and 39.1. He argues that mother's appeal was substantially frivolous because mother failed to preserve her arguments or had waived them. He also asserts that mother's arguments were misleading and based on misrepresentations and exaggerations of the record evidence.

¶ 43    We decline to award fees under section 13-17-102(4). Although unsuccessful, mother's appeal was not so lacking in merit as to constitute frivolity or bad faith. *See Mission Denv. Co. v. Pierson,* 674 P.2d 363, 365 (Colo. 1984) ("Standards for determining whether an appeal is frivolous should be directed toward penalizing egregious conduct without deterring a lawyer from vigorously

asserting his client's rights."); *see also In re Marriage of Boettcher*, 2018 COA 34, ¶ 38 ("Fees should be awarded only in clear and unequivocal cases . . . ."), *aff'd*, 2019 CO 81.

## V.  Disposition

¶ 44      We affirm the district court's order allocating parental time and decision-making responsibilities.

JUDGE YUN and JUDGE SCHOCK concur.